RITA W. GRUBER, Chief Judge
Appellant Nikki Wright appeals from an order of the Sebastian County Circuit Court terminating her parental rights to DW, born 12/30/2015. On appeal, appellant contends that (1) the trial court abused its discretion in denying appellant's motion for continuance, and (2) the trial court erred in finding that termination of appellant's *829 parental rights was in the best interest of DW.[1] We disagree and affirm.
On September 1, 2016, the Arkansas Department of Human Services (DHS) exercised an emergency hold on DW. In a petition for emergency custody and dependency-neglect filed September 6, 2016, DHS alleged that DW was dependent-neglected as defined by Ark. Code Ann. § 9-27-303 (Supp. 2017). The affidavit in support of the petition alleged that DHS received a referral for failure to protect stating that appellant smokes "meth" around DW and takes DW "on service calls for prostitution." The affidavit further alleged that a DHS investigation occurred on September 1, 2016, which revealed the following: appellant had been working as a stripper at a gentlemen's club; she had multiple online ads on " 'Backpage' aka Fort Smith Backpages online," a medium known for advertising escort services and prostitution; the home was cluttered with pornographic DVDs, Playboy magazines, and sexual paraphernalia within arm's reach of a child; there were small baggies all over the floor and a glass orange "meth" pipe; appellant tested positive for meth and THC; appellant stated the last time she consumed both was a week prior with DW's father; appellant stated DW's father had beaten her; appellant indicated she had given custody of DW to her mother by signing a form from the internet; appellant's mother arrived during the investigation and was arrested for narcotics; and appellant was arrested for possession of drug paraphernalia and endangering a minor. DHS exercised a seventy-two-hour-hold on DW.
On September 6, 2016, the court granted the petition for emergency custody, and a probable-cause hearing took place September 7, 2016. The court found that there was probable cause that the emergency conditions that necessitated the removal of DW continued and that it was necessary for DW to remain in the custody of DHS based on parental unfitness because of appellant's drug use. On October 26, 2016, the court conducted an adjudication hearing and found that the allegations were true, specifically finding that DW was dependent-neglected due to parental unfitness and neglect due to appellant's drug use. The court set the goal of reunification and ordered that appellant have supervised visitation once a week. The court also provided that if the genetic testing showed that the putative father, Colby Bullington, is the biological father of DW, DHS had discretion to schedule visits between Bullington and DW. Appellant was ordered to obtain and maintain safe, stable, and appropriate housing; obtain and maintain verifiable employment and income sufficient to support the family; provide documentation of her income to DHS and of appropriate and safe transportation; comply with random drug screens, alcohol swabs, and hair-follicle tests; attend and complete a psychological evaluation and comply with recommendations; attend and complete parenting classes and provide proof of completion to DHS; visit DW regularly and appropriately; keep DHS apprised of her updated contact information; and inform DHS of any significant life changes. A review hearing was set for February 22, 2017. The order from the October 26 hearing was filed November 29, 2016.
Following a review hearing on March 10, 2017, the court found that appellant had partially complied with the court orders and case plans:
*830 Specifically, the Court finds the mother has: failed to maintain housing, the mother has only recently moved into a new residence in her mother's name; failed to obtain transportation, the mother has a suspended license, but she is still driving and has been arrested for driving with a suspended license; failed to obtain stable employment and has reported several employers in the past few months; the mother is participating in drug court, but has been late and has had to serve 24 hours in jail because of that; has complied with a drug and alcohol assessment and treatment and is complying with parenting and domestic violence classes, although it is reported that the mother arrives late, leaves early and plays on her phone during her parenting classes.
A permanency-planning hearing was held on August 30, 2017. The court found that Colby Bullington is DW's legal father. The court ordered that the goal of the case be changed to adoption with DHS filing a petition for termination of parental rights. The court found that appellant had partially complied with the case plan but that she was incarcerated at the time of the hearing after multiple drug sanctions; that although she had complied with parenting education, the provider recommended further services due to her behavior and lack of improvement within the course; and that appellant had not visited DW since her incarceration.
The permanency-planning order was entered September 20, 2017. Prior to its entry, DHS filed a petition for termination of parental rights on September 18, 2017. A termination hearing took place on November 29, 2017.
At the hearing, appellant testified that she had been kicked out of drug court for fraternizing with felons and was incarcerated at the time of the termination hearing. She explained that she had been in drug court as a result of the conviction for drug paraphernalia found when DW was taken away. She testified that methamphetamine and weed were her "drugs of choice" and that she and Bullington used to do drugs together. Appellant explained that she and Bullington were no longer in a relationship but that he had been abusive, and sometimes the abuse occurred when DW was present. She tried to leave Bullington, but he would not let her. She said that Bullington had beaten her, including one time with her stripper pole; threatened to kill her; and once threatened to throw DW off a balcony to get appellant to stay.
Appellant testified that she had been incarcerated since April 5, 2017, but had "made parole" and planned to go to OMART and the SWS program. She stated she did not have a place to go when she was released; had not gotten a driver's license and no longer had a vehicle; had not done drugs since DW was taken away; had not completed her parenting classes or domestic-violence classes; and had not visited DW since she was incarcerated in April 2017. Appellant hoped to save enough money during the sixteen-week OMART program to obtain an apartment and get a car. Appellant did not test positive while she was in drug court, and the sanctions she received were for being late and fraternizing. Appellant testified that after her relationship with Bullington ended she began seeing C.J. Holden, who was a pimp. She stated she had an ad for dancing, which ran for a couple of months on "Backpage."
Colby Bullington testified that he was currently incarcerated on a rape charge. Bullington admitted physically abusing appellant about five times. He said he had slapped her and choked her but denied beating her with a pole or threatening to *831 throw DW off the roof or out of the window. Bullington stated that nothing about appellant's lifestyle concerned him except her drug use. He indicated that he was kicked out of drug court because of the rape charge, which he thought he would "beat." He testified that he was sanctioned in drug court for being late, falling asleep in class, and failing two tests.
Melissa Roth, family service worker for DHS, testified that DHS recommended termination of parental rights. She explained that the case had been open for fourteen months and the parents were not ready to have DW at home with them. She stated that appellant had definitely been trying. Roth could not understand how appellant's hair-follicle tests were negative when they included the September 1, 2016 timeframe when appellant admitted using drugs and tested positive on screens the day DW was removed. The last housing reported to Roth was in appellant's mother's name, which Roth did not think was a good situation because if appellant and her mother got into an argument, appellant could be without a residence. Roth testified that appellant had reported multiple jobs and had not been able to show steady income. With regard to transportation, Roth said that appellant did not have a driver's license and actually prolonged a "stay" on her license because she drove to the test. Roth said appellant did attend parenting classes, but the provider recommended further classes. Roth did not have certificates showing that appellant had completed parenting or domestic-violence classes.
Roth's biggest concern was appellant's ability to make good choices, noting that appellant's inappropriate choices put DW in danger. Roth stated that appellant stayed with Bullington even though he was physically violent to both her and DW. Roth testified that appellant had not been able to show stability and self-sufficiency; that DW was two years old and deserved permanency; and that DW should not have to wait longer. Roth explained that DHS offered services, but the parents had not significantly complied. Roth testified that instead of completing their services, the parents made bad choices and both were incarcerated. Roth opined that DW would be placed at risk of physical and psychological harm if returned to the parents and that the parents were in a worse position than they had been at the beginning of the case as they were both incarcerated. Roth testified that the parents had not remedied the conditions that caused DW's removal, and she did not know of any other services that could be offered to the parents to return DW in a time that was appropriate from DW's perspective. Roth indicated that DW was adoptable, had no issues to impede adoption, and had been in a long-term placement. She stated DW deserved permanency and thought it was in DW's best interest for the parental rights to be terminated and DW placed for adoption.
Ruling from the bench, the court terminated appellant's parental rights based on the grounds of failure to remedy, subsequent factors, and aggravated circumstances. The written order was filed April 18, 2018.
I. Denial of Motion for Continuance
At the beginning of the termination hearing on November 29, 2017, appellant asked for a continuance on the basis that she had been approved for OMART, a halfway house. Appellant argued that she should be released from the penitentiary to OMART by the end of the year, which would give her the opportunity to show the court "what she is capable of doing." The court denied the motion on the ground that the case originated in September 2016, nearly fifteen months prior, and something *832 permanent needed to be done, but stated that it might change its decision based on the testimony.
We will not reverse the denial of a motion for continuance absent an abuse of discretion amounting to the denial of justice. Smith v. Ark. Dep't of Human Servs. , 93 Ark. App. 395, 401, 219 S.W.3d 705, 708 (2005). A trial court abuses its discretion when it acts improvidently and without due consideration. Henderson v. Ark. Dep't of Human Servs. , 2010 Ark. App. 481, 2010 WL 2186438. Additionally, in order to prevail on appeal, an appellant must demonstrate prejudice from the denial of a motion for a continuance. Campbell v. Ark. Dep't of Human Servs. , 2016 Ark. App. 146, at 3-4, 2016 WL 815652.
Appellant acknowledges that under normal circumstances she would have a difficult time establishing that the court's denial of the continuance was an abuse of discretion, but she argues that under the facts of this case, the abuse of discretion is "readily apparent" because the trial court failed to enter a written order memorializing its November 29 oral ruling until April 18, 2018. She argues that the trial court denied her request for continuance to complete the four-month OMART program, but then waited over four months to enter its order. She states she was prejudiced by the denial of her motion because the oral ruling had no effect on DW's permanency; thus, the court denied her the chance of receiving continued services, and she was not permitted to demonstrate that she could complete the OMART program to become fit and appropriate to care for DW.
Citing Brown v. Arkansas Department of Human Services , 2016 Ark. App. 455, 2016 WL 5799480, DHS argues there was no abuse of discretion. The appellant in Brown asked for a six-week continuance to attend a drug-treatment program for which he was on a waiting list to attend. We affirmed:
In this case, we hold that the circuit court did not abuse its discretion and that Brown cannot demonstrate prejudice. Brown did not request the continuance until the beginning of the termination hearing, which demonstrated lack of diligence sufficient to support the denial. See Martin v. Ark. Dep't of Human Servs. , 2015 Ark. App. 407, 465 S.W.3d 881. Moreover, there was no prejudice because Brown's past behavior indicated that even if the court allowed a continuance, he was not likely to follow through with all of the steps necessary for reunification. See id.
Brown , 2016 Ark. App. 455, at 4.
In the present case, appellant did not ask for the continuance until the beginning of the termination hearing. Moreover, she requested time to complete a four-month program. Likewise, appellant fails to show prejudice because her past behavior demonstrated a history of noncompliance such that even if the court granted the continuance, she was not likely to follow all the steps necessary for reunification. Roth, the DHS caseworker, thought that being in treatment for four months would prevent appellant from reaching the level of having her own residence or anything of that nature. While appellant thought she would be able to get back to the place she was in before her incarceration, Roth did not think it was realistic based on her being in treatment for four months.
There is no merit to appellant's argument that the court abused its discretion in denying the continuance based on permanency but failing to enter the termination order until four months after the oral ruling. While Arkansas Code Annotated section 9-27-341(e) requires the trial *833 court to enter the termination order within 30 days after the permanency-planning hearing, our case law holds that compliance is little more than a "best practice," the violation of which does not warrant reversal or any other sanction. Blasingame v. Ark. Dep't of Human Servs. , 2018 Ark. App. 71, at 8, 542 S.W.3d 873, 877 (citing Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 360, 990 S.W.2d 509, 514 (1999) (holding that failure to file an order within the mandatory time frame does not result in a loss of jurisdiction "because the General Assembly did not provide a sanction for an untimely filing and because there is no evidence that such a result was intended") ). Further, the order of the trial court is simply a written judgment of what the court announced from the bench. Therefore, appellant suffered no real prejudice because the order was entered to show what actually occurred. See Wade , supra.
II. Best-Interest Determination
Appellant does not challenge the grounds supporting termination; she argues only that termination was not in DW's best interest. We review termination-of-parental-rights cases de novo. Wilson v. Ark. Dep't of Human Servs. , 2015 Ark. App. 666, at 7, 476 S.W.3d 816, 821. The trial court must make two findings by clear and convincing evidence: (1) at least one statutory ground must exist and (2) it must be in the child's best interest to terminate parental rights. Ark. Code Ann. § 9-27-341. In making a best-interest determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. Smith v. Ark. Dep't of Human Servs. , 2013 Ark. App. 753, at 4, 431 S.W.3d 364, 367. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Brown v. Ark. Dep't of Human Servs. , 2015 Ark. App. 725, at 4, 478 S.W.3d 272, 275. In determining whether a finding is clearly erroneous, we give due deference to the opportunity of the trial court to judge the credibility of witnesses. Greenhill v. Ark. Dep't of Human Servs. , 2017 Ark. App. 194, at 5, 517 S.W.3d 473, 476-77.
Although appellant does not challenge the adoptability factor of the best-interest determination, she does contend that substantial evidence does not support the trial court's finding of potential harm. The trial court found that DW "would be at substantial risk of serious emotional, mental, physical harm if returned to the parents due to the parents' lack of compliance with the case plan and court orders, their instability, and their continued criminal lifestyle."
Appellant argues that the court's finding is not supported by substantial evidence because she tried to comply with the orders and case plan, which was recognized by her caseworker. While there was partial compliance, appellant's caseworker testified that she had not shown stability or improvement but had instead declined during the course of the case. Roth testified that her major concern with appellant was her ability to make good choices. At the time of the termination hearing and fourteen months into the case plan, appellant was incarcerated as a result of drug court sanctions. Although the sanctions were not due to testing positive for drugs, they were the result of appellant's actions of being late and fraternizing with felons. At the hearing, appellant acknowledged she did not have a home, an income, a driver's license, or transportation.
While appellant stated that she had been paroled and planned to enter the four-month OMART program, no evidence *834 was introduced to indicate a definite time frame in which this would occur. Appellant's caseworker indicated that four months would prevent appellant from reaching the level of having her own residence or anything of that nature. While appellant thought she would be able to get back to the place she was in before her incarceration, Roth did not think it was realistic based on her being in treatment for four months. Roth testified that appellant had not been able to show stability and self-sufficiency and that DW was two years old and deserves permanency.
In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. Gulley v. Ark. Dep't of Human Servs. , 2016 Ark. App. 367, 498 S.W.3d 754 ; Welch v. Ark. Dep't of Human Servs. , 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability of a permanent home. Robinson v. Ark. Dep't of Human Servs. , 2017 Ark. App. 262, at 5, 520 S.W.3d 322, 325. A parent's past behavior is often a good indicator of future behavior. Hughes v. Ark. Dep't of Human Servs. , 2017 Ark. App. 554, at 11, 530 S.W.3d 908, 914. A parent has an affirmative duty to protect his or her child from harm. Id.
Considering the evidence overall, the potential harm is clear. DW had been in DHS custody for almost fifteen months, and appellant was incarcerated at the time of the hearing, awaiting release to then enter a four-month program. The evidence showed appellant lacked the stability of a home, an income, and transportation. DW would be required to wait until appellant potentially reached a point of stability to care for DW. The intent of the termination statute is "to provide permanency in a juvenile's life in all circumstances where return to the family home is contrary to the juvenile's health, safety or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark. Code Ann. § 9-27-341(a)(3). Accordingly, based on the potential-harm factor, we cannot say that the trial court clearly erred in finding that termination was in DW's best interest.
Affirmed.
Glover and Murphy, JJ., agree.

The court also terminated the parental rights of Colby Bullington; however, Bullington is not a party to this appeal.